UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-538-H

STEVE HODGES                                                                                           PLAINTIFF

V.

FORD MOTOR COMPANY and
JACK HALVERSON                                                                                      DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff, Steve Hodges ("Hodges"), has filed suit against Ford Motor Company ("Ford"), his former employer, and Jack Halverson ("Halverson") asserting a claim for defamation under Kentucky law. Discovery is now complete and the Defendants have moved for summary judgment. The alleged defamatory words were, in fact, Halverson's explanation of the reasons for terminating Hodges, made during a closed door meeting in the presence of another Ford employee. The motion turns on whether the qualified privilege for conversations about employee conduct at work applies in these circumstances.

I.

Hodges was a Manufacturing Engineering Manager in Ford's truck plant in Louisville, Kentucky between December 2000 and April 2004. Halverson is the Human Resources Manager at the truck plant.

Ford's Standards of Corporate Conduct described, in relevant part, in Policy Letter No. 3 ("Policy C-3"), governed his employment. Policy C-3 regulates the number of meals and entertainment events paid for by Ford part-suppliers that a Ford employee may attend. It provides that a Ford employee may not attend more than four supplier-paid meals per year, per

supplier and may not attend more than two entertainment events per year, per supplier. Morever, under Policy C-3, an employee may not attend a supplier-escorted event that requires an overnight stay without a special exemption from a company vice president. Ford parts-suppliers are required to maintain a record of the meals and entertainment events that they provide for Ford employees. Those expense records are subject to audit by Ford.

In 2003, Halverson conducted an audit of Policy C-3 activity for Abel Construction, a supplier at Ford's truck plant in Louisville. According to Abel Construction's own records, Hodges had not violated Policy C-3 in any way. Bill Kirk ("Kirk"), the plant controller, interviewed Hodges as part of the audit. Halverson informed Hodges of the audit. He addressed each of the events listed on the Abel Construction expense report. He asked Hodges which ones he had attended to verify Abel's information. At the conclusion of the meeting, Halverson told Hodges to keep everything that they had discussed confidential.

Upon further review the day after that meeting Halverson discovered information that was inconsistent with Hodges's statements. Halverson interviewed Hodges again and reviewed which events he had attended. Hodges reiterated his answers and volunteered to help Halverson investigate the matter further, offering to "sit down across the table and sort it out, whatever you've got." Halverson declined the offer and told him that the information he already had "will be fine."

Defendants allege that sometime during the course of the investigation, Halverson spoke to Amy Snider ("Snider"), the Final Area Manager. Snider said that Hodges had told her about the Abel Construction audit. She also said that Hodges had asked her to lie on his behalf in order to help him avoid a violation of Policy C-3. In particular Hodges allegedly asked her to lie about

a dinner on June 13, 2003 at Stony River Restaurant. The records that Abel Construction had turned over indicated that Snider had attended that dinner but that Hodges had not.

Halverson concluded that the records turned over by Abel Construction were inaccurate. He contacted Abel Construction's management and asked them to verify those reports and revise any errors contained therein. They allegedly corrected a number of errors and returned a revised copy of its 2003 expense records. According to Defendants, Abel Construction's revised records show that Hodges committed three Policy C-3 violations in 2003. The records show that Hodges attended five meals, including the meal on June 13 at Stoney River, and five entertainment events all paid for by Abel Construction in 2003. The revised records also show that he attended an overnight event paid for by Abel Construction without prior approval from a Ford vice president.    Hodges, however, has testified that the Abel Construction revised records are inaccurate. He admits that he attended an overnight trip sponsored by Abel Construction without prior approval. He also admits that he attended four meals paid for by Abel Construction in 2003. But he has testified that he never attended a fifth meal in 2003 and that therefore, he complied with the C-3 regulations.[1] He further admits that he attended five entertainment outings sponsored by Abel Construction. However, he has testified that he paid his own way on three of the events, meaning that he attended only two Abel Construction sponsored events in 2003.

On February 13, 2004, Halverson asked Hodges if he had discussed the Abel Construction Policy C-3 audit with anyone. Hodges said that he had not. Halverson suspended Hodges, pending an investigation.

---

[1] Specifically, Hodges testified that he never attended the dinner sponsored by Abel Construction on June 13, 2003 at Stony River.

3

Over two months later, Halverson met with Hodges again on April 24, 2004. The meeting was held in a private office with the door closed. Chuck Hoffman ("Hoffman"), Ford's Salaried Personnel Supervisor, was also present. During the meeting, Halverson notified Hodges that he was being fired. He made the following statement:

> [W]e find you in violation of C-3 . . . for too many meals with a supplier in a quarter. . .. We also find you in violation of C-3 policy regarding too many entertainment . . . too many outings per year per supplier [sic]. We find you in violation of going on an overnight trip without your manager's approval. We . . . asked you to keep this confidential. We find you in violation of . . . breach of trust, or confidentiality . . . for speaking to other Ford employees. We also find you in violation of speaking to vendors. . . . Based on this, we feel it's in the best interest of the company to sever all ties. . . . You're fired.

Plaintiff claims that Halverson's statement, which was made in the presence of Hoffman, was defamatory.

## II.

Summary judgment is appropriate if no genuine issue of material facts exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Based on this standard, Defendants are entitled to summary judgment.

To establish a prima facie case of defamation, the plaintiff must show (1) defamatory language, (2) about the plaintiff, (3) which is published and (4) causes injury to his reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004) (quoting *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981)). Kentucky law provides that

published works are actionable per se if they directly tend to prejudice or injure persons in their profession, trade, or business. *Brewer v. American Nat'l Ins. Co.*, 636 F.2d 150, 154 (6th Cir. 1980) (interpreting Kentucky law). At issue here are accusations of unethical professional conduct against Hodges. Accordingly, they are defamatory per se, which means that "damages are presumed and the person defamed may recover without allegation or proof of special damages." *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953).

Halverson's statements were also "published," as that term has been defined by Kentucky courts. "Defamatory language is 'published' when it is intentionally or negligently communicated to someone other than the party defamed." *Stringer*, 151 S.W.3d at 794 (internal citation omitted). Even though Halverson and Hoffman worked in the same corporation, Halverson's statement was published for the purposes of Hodges's defamation action. *See Brewer*, 636 F.2d at 153-54 (holding that an internal communication between two employees working for the same corporation was "published" for the purposes of Kentucky law despite a contrary rule in other jurisdictions).

Under Kentucky law, however, statements "made in good faith, without malice, by one who believes he has a duty or an interest to a person with a corresponding duty or interest" are protected by a qualified privilege. *Brewer*, 636 F.2d at 154. The existence of the qualified privilege is a matter of law for the court to decide. *Landrum v. Braun*, 978 S.W.2d 756, 758 (Ky. Ct. App. 1998) (citation omitted). Generally, Kentucky courts have held that the privilege protects defamatory statements made within a company if those statements concern the conduct of employees. *Stringer*, 151 S.W.3d at 796. In this case, the statements were internal communications between two Ford employees concerning an employee's violation of ethical

5

rules. Therefore, as a general matter, Halverson's statements about Hodges's termination seem to fall within the qualified privilege.

## III.

Because the privilege generally applies to Halverson's statements, Hodges bears the burden of showing either that the privilege has been abused or exceeded . *See, e.g.*, *Stringer*, 151 S.W.3d at 797 ("the privilege can be lost if abused or exceeded"). Hodges makes several arguments asserting that the privilege should not apply. The Court will address each in turn.

### A.

First, Hodges argues that Halverson exceeded the privilege by disclosing facts that were irrelevant to the interest entitled to protection. *See Brewer*, 636 F.2d at 154 ("The privilege does not extend to matters irrelevant to the public or private interest entitled to protection."); *see also Tucker v. Kilgore*, 388 S.W.2d 112, 114-15 (Ky. 1965). Specifically, he argues that although Halverson had a duty to notify Hoffman of the fact of Hodges's discharge, he did not have a duty to notify him of the reasons for the discharge.

At the time he made the statements at issue, Halverson was the Human Resources Manager at the Kentucky truck plant. In that capacity, he enforced Ford's Code of Corporate Conduct, reported any violations of that code and notified Ford personnel of employee discharges. Hoffman was the Salaried Personnel Supervisor, charged with ensuring that Ford's policies and procedures were followed by salaried employees, like Hodges. Common sense suggests that when a salaried employee is terminated from his employment, Hoffman had a duty to ensure that the reasons for the termination and the process used during the termination complied with Ford's policies and procedures. His actual presence during the termination was

6

the most reasonable way of accomplishing this.

Hodges argues, however, that Hoffman had no right to know the reasons for Hodges's termination. As evidence of this allegation, Hodges stated in his affidavit that "[a]ll of the training that I received during my tenure of employment . . . indicated that when disciplining an employee, any witness to the discipline should be at least one level of responsibility above the employee who was being disciplined." Hoffman, he says, was lateral in responsibility to him.

Even if Hodges's allegation is true, it does not affect the Court's analysis of the privilege.[2] The scope of the qualified privilege does not depend on Hodges's understanding of Hoffman's rights and duties. Rather, it depends on Halverson's understanding of them. The question the Court must decide is whether Halverson believed that Hoffman was entitled to be advised of the reasons for Hodges's discharge. *See Brewer*, 636 F.2d at 154 (a publication is qualifiedly privileged if made "by one who believes he has a duty or an interest to a person with a corresponding duty or interest"); *see also Rich ex rel. Rich v. Kentucky Country Day, Inc.*, 793 S.W.2d 832, 838 (Ky. Ct. App. 1990) (to form the basis of the qualified privilege a duty "'may be one of doubtful or imperfect obligation'") (citation omitted). This is precisely what the evidence establishes. In his affidavit Halverson asserted that he believed he had a duty to notify Hoffman any time he discharged a salaried employee and to explain his reasons for doing so. Although Hodges was trained not to discipline an employee in the presence of employees lateral to him or her, there is no evidence that Halverson received the same training. Hoffman's duties,

---

[2] Hodges's affidavit does not, strictly speaking, establish that there was an internal rule that prohibited Halverson from discussing Hodges's discharge with Hoffman. If there were such an internal rule and Halverson was aware of it, the case could be different. However, even considered in the light most favorable to the plaintiff, the affidavit only establishes that Ford preferred discipline to be carried out in the presence of the disciplined employees' superiors–that discipline "should" be done this way.

7

his job description and his job title all indicate that Halverson's belief that Hoffman was entitled to be present was reasonable and supported by the evidence. Moreover, Halverson conducted the meeting in a private office with the door closed in an effort to prevent persons who were not entitled to learn about Hodges's discharge from overhearing. Therefore, the Court concludes that Halverson did not exceed the scope of his privilege.

C.

In the alternative, Hodges argues that Halverson acted with actual malice and that therefore, the qualified privilege was abused. Actual malice "'requires a showing of knowledge of falsity of the defamatory statement or reckless disregard of its truth or falsity.'" *Stringer*, 151 S.W.3d at 799 (quoting *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 885 (Ky. 1981)). Hodges argues that a reasonable jury could infer actual malice here based on three factual allegations: (1) the statements Halverson made were factually false; (2) Halverson refused to give Hodges an opportunity to disprove the allegations against him; and (3) Halverson bore "ill will" and "hatred" towards Hodges. The Court will address each of these arguments in turn.

Under Kentucky law actual malice can be inferred from falsity alone provided that the circumstances warrant such an inference. *See Stringer*, 151 S.W.3d at 797 ("'the offensive character of the words still is sufficient by itself to support an inference of malice'") (quoting *Tucker*, 388 S.W.2d at 114).

In *Stringer*, the plaintiffs had been employees at a Wal-Mart store and had been terminated for eating "claims candy."[3] In their suit, they alleged that after they were terminated,

---

[3] "Claims candy" is candy from open or torn bags removed from the store shelves and kept in the claims area.

8

various Wal-Mart employees made defamatory statements about them.  One of the statements was made by an assistant manager at Wal-Mart in a conversation with three other Wal-Mart employees.  The assistant manager was asked whether the plaintiffs had been terminated for eating claims candy and in response, he stated that "there was more to it than that."  The court held that the qualified privilege did not protect the assistant manager's statement because the plaintiffs had presented sufficient proof of actual malice.  *Id.* at 788-89.  The court reasoned that the statement "could reasonably have been . . . interpreted as an assertion that [the plaintiffs] had stolen items in addition to claims candy." *Id.* at 798.  The assertion that there was "more to it than that" appeared to the court to "have no factual basis whatsoever." *Id.* at 788-89.  Therefore, the court held that the plaintiffs' proof of the falsity of the statements alone was sufficient to establish actual malice. *Id.*

Even if the Court were to assume that the factual charges concerning violations of Policy C-3 are actually false, these circumstances do not permit an inference of malice.  Unlike the assistant manager in *Stringer,* Halverson had substantial factual support for the truth of his statements.  An independent audit, conducted by Abel Construction, indicated that Hodges had in fact attended five dinners and five entertainment events paid for by Abel Construction.  Abel Construction's upper management conducted the audit at Halverson's request to verify the accuracy of its own records.  Moreover, Hodges conceded from the very beginning that he had attended an overnight trip sponsored by a supplier without prior approval.  He conceded that he had attended each of the five entertainment events listed in Abel Construction's expense reports,

9

although he said that Abel Construction had not paid for each of the events.[4] And he conceded that he had attended four Abel Construction-provided dinners. Moreover, Amy Snider and two other Ford employees provided direct support for the claim that Hodges had breached his duty of confidentiality.[5] Even if Amy Snider and the others were lying, Hodges has presented no evidence suggesting that it was reckless for Halverson to believe them. The factual and evidentiary support for Halverson's statements simply precludes a reasonable inference of recklessness based on falsity alone.

Next, Hodges argues that actual malice can be inferred from the deficiency of the investigation that Halverson carried out. Specifically, Hodges alleges that he volunteered to help Halverson investigate the accuracy of the Abel Construction audit on December 24, 2003 and Halverson refused his offer. Hodges further alleges that he was never given any meaningful opportunity to refute the allegations against him. Generally, the failure to investigate obvious sources of refutation of allegedly defamatory statements may indicate actual malice. *See, e.g.*, *Kentucky Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785 (Ky. 2005) (defining actual malice in the context of the First Amendment privilege to defamation suits). In this case, however, Halverson's investigation was thorough and complete and Hodges was given repeated opportunities to present his side of the story. During the course of his investigation, Halverson interviewed Hodges on two occasions. In each of those interviews, Halverson asked Hodges which events he had attended and who had paid for them. He also sent Hodges at least one email

---

[4] Hodges' dispute is that he paid his own way when he attended two of those entertainment events. He also alleges that the fifth entertainment event reflected in the Abel Construction expense records was actually sponsored by another supplier.

[5] Amy Snider and two other employees told Halverson that Hodges had been discussing the Abel Construction audit with them and with Abel Construction employees as well.

asking him whether he had discussed the audit with anyone, to which Hodges sent a reply. Moreover, during his investigation, Halverson reviewed two separate expense reports from an independent auditor that confirmed that Hodges in fact violated Policy C-3. Based on this evidence, no reasonable jury could conclude that Halverson acted recklessly as to the truth or falsity of the statements at issue.

D.

Finally, Hodges argues that Halverson's "ill will" and "hatred" towards Hodges constitutes sufficient proof of actual malice.[6] In Kentucky, the relevance of a defendant's ill will or hatred towards the plaintiff in a defamation action is not entirely clear. *See Columbia Sussex Corp.,* 627 S.W.2d at 276 (with regard to a punitive damages award in a defamation action, a showing of malice "depends not upon actual ill will or intent to harm but rather upon a knowledge of falsity or reckless disregard for the truth."). As a logical matter, though, if Halverson bore ill will towards Hodges, that proof could be relevant to show that Halverson had a motive to recklessly accuse Hodges of misconduct. However, as discussed above, no evidence shows that Halverson actually did act recklessly. Therefore, no reasonable jury could conclude that Halverson abused the qualified privilege.

IV.

The Court concludes that the qualified privilege protects Halverson's statements. Halverson reasonably believed that he had a duty to explain his precise reasons for terminating Hodges. He also reasonably believed that Hoffman, an employment official responsible for salaried employees, should be present for the explanation. Halverson's actions were clearly

---

[6] As evidence of Halverson's "ill will," Hodges testified that in April of 2003, Halverson berated him for making changes to the personnel schedule. Halverson allegedly told him that "you better watch yourself."

11

within the scope of his work and were based upon a substantial, credible investigation. As such, the statements at issue were "communications within the employing company which are necessary to its functioning." *Caslin v. General Electric Co.*, 608 S.W.2d 69, 70 (Ky. Ct. App. 1980) (defining qualified privilege). Under these circumstances, therefore, Steve Hodges has no grounds for asserting a claim for defamation against either Ford Motor or its employee, Halverson, under Kentucky law.

      The Court will enter an order consistent with this Memorandum Opinion.

cc:    Counsel of Record